1  RALPH B. KALFAYAN, Esq. SBN 133464
   KRAUSE KALFAYAN BENINK & SLAVENS, LLP
2  550 W. C Street, Suite 530
   San Diego, CA 92101
3  Telephone:    (619) 232-0331
   Facsimile:    (619) 232-4019
4

5

   Attorney for Plaintiff
6

7                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
8                        (NORTHERN DIVISION)

9                                          )
10 PAUL BONDAR, individually and on behalf of all )  Case No.
   others similarly situated,              )
11                                         )
                                  Plaintiff, )  CLASS ACTION
12                                         )
                                           )  CLASS ACTION COMPLAINT FOR
13        v.                               )  ANTITRUST INJURY
                                           )
14 EXPEDIA, INC., HOTELS.COM LP,           )
   TRAVELOCITY.COM LP, SABRE HOLDINGS      )
15 CORPORATION, PRICELINE.COM              )  DEMAND FOR JURY TRIAL
   INCORPORATED, BOOKING.COM B.V.,         )
16 BOOKING.COM (USA) INC., ORBITZ          )
   WORLDWIDE, INC., HILTON WORLDWIDE       )
17 INC., STARWOOD HOTELS & RESORTS         )
   WORLDWIDE, INC., MARRIOTT               )
18 INTERNATIONAL, INC., TRUMP              )
   INTERNATIONAL HOTELS MANAGEMENT         )
19 LLC, KIMPTON HOTEL & RESTAURANT         )
   GROUP, LLC, INTERCONTINENTAL HOTELS     )
20 GROUP RESOURCES, INC., AND DOES 1-100,  )
                                           )
21                                         )
                                           )
22                                Defendants. )
                                           )
23

24 _____

25

26

27

28
                              - 1 -
   CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

2                                                                                      **PAGE**

3   I.     NATURE OF ACTION AND SUMMARY OF ALLEGATIONS.......................3

4   II.    THE PARTIES....................................................................................6

5          A.    Plaintiffs.................................................................................6

6          B.    Defendants..............................................................................6

7          C.    Agents and Co-Conspirators......................................................8

8   III.   JURISDICTION AND VENUE...............................................................8

9
10  IV.    STATEMENT OF FACTS.......................................................................9

11         A.    The Emergence of OTA's...........................................................9

12         B.    The OTA Defendants Conspired with the Hotel Defendants to Eliminate
                 Discounting Below the Rate.......................................................11
13
14         C.    Defendants Monitored and Enforced the Price-Fixing Agreements...............17

15         D.    The Price-Fixing Agreements have Purposefully Resulted in "Rate Parity"
                 For Hotel Rooms Booked Through Online Room Reservations – Allowing
16               The OTA Defendants to Always Guarantee the "Best" though same Rates.......21

17         E.    Governmental Investigations......................................................24

18  V.     MARKET EFFECTS OF AND ANTITRUST INJURY TO DEFENDANTS'
19         ANTICOMPETITIVE CONDUCT..........................................................25

20  VI.    CLASS ALLEGATIONS.......................................................................26

21  VII.   TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT
22         CONCEALMENT, EQUITABLE TOLLING, AND CONTINUING VIOLATIONS...28

23  VIII.  COUNTS..........................................................................................29

24         COUNT I VIOLATION OF 15 U.S.C. § 1
           (AGREEMENTS UNREASONABLY RESTRAINING TRADE).......................29
25
26         COUNT II VIOLATION OF THE MARYLAND ANTITRUST ACT
           MD. CODE ANN., COMM. LAW §§ 11-201 *et. seq.* ...........................30
27
           PRAYER FOR RELIEF.......................................................................32

28

CLASS ACTION COMPLAINT

Direct Purchaser Plaintiff Paul Bondar ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on Plaintiff's personal knowledge and conduct, and as to all other allegations, based on information and belief, and investigation by counsel.

## I.    NATURE OF ACTION AND SUMMARY OF ALLEGATIONS

1.      Plaintiff brings this class action on behalf of himself and a class of similarly situated persons who directly booked a hotel room through the internet from one or more of the Defendants in the United States.   Plaintiff's direct purchaser antitrust action against Defendants is rooted in Defendants' illegal price-fixing conspiracy to manipulate and artificially inflate prices for Online Room Reservations.  Accordingly, Plaintiff seeks damages and equitable relief from Defendants under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under the Maryland Antitrust Act, MD. CODE ANN., COMM. LAW §§ 11-201 et seq.

2.      Defendants comprise the dominant online travel companies that provide Online Room Reservation, among other services they offer, in the United States.  Defendants engaged in unlawful conduct by conspiring with the Hotel Defendants and agreed to fix the retail price of Online Room Reservations at an artificially maintained price floor and to restrain competition in the market for Online Room Reservations (the "Price-Fixing Agreements").  Said Price-Fixing Agreements included express terms to set, maintain, and enforce prices at designated Rack Rates for Online Room Reservations.

3.      Defendants' Price-Fixing Agreements were part of an anticompetitive scheme through which Defendants unlawfully conspired with each other to utilize and leverage their substantial market power and dominance in the market for Online Room Reservations to cause the Hotel Defendants to agree to list hotel room prices on their own websites at or above the

CLASS ACTION COMPLAINT

Rack Rate, prevent non-defendant Online Travel Agents ("OTAs") from listing hotel room prices below the Rack Rate, and/or refuse to supply or cut off the supply of hotel rooms to competing OTAs that did not adhere to the Price-Fixing Agreements.  These Price-Fixing Agreements were made to and in fact resulted effectively eliminating price competition for Online Room Reservations.

4.     Defendants' unlawful and anticompetitive conduct resulted in Defendants collectively agreeing not to book or advertise Online Room Reservations for less than the Rack Rate.  None of the Defendants compete with respect to price, and the retail rates for Online Room Reservations are set at Rack Rates, and are therefore practically identical among the OTA Defendants and each Hotel Defendants because the OTA Defendants have the same clause, whether oral or written, in most if not all of their agreements with the Hotel Defendants.

5.     Defendant Sabre, which operates Travelocity and Booking.com, has admitted the existence of the unlawful conspiracy alleged, specifically, Nancy St. Pierre, a spokeswoman for Sabre Holdings, confessed that "[t]his is a standard industry practice." Furthermore, while Ms. Pierre asserts that technically "hotels are not required to participate in rate parity," Ms. Pierre simultaneously conceded that should a hotel fail to agree, it "will be...lower in the search [results] list than hotels that do want to offer" parity.  Such placement at the lower end of search results, possibly even resulting in failure to appear on the first page serves as the kiss of death since consumers usually only select links at the top of search result lists.

6.     Defendants' "best price guarantees" are little more than a slight-of-the-hand and effort to distract consumers from Defendants' unlawful conspiracy to fix prices.  Specifically, these alleged bargain prices or best prices are offered by all Defendants with full knowledge that said prices for Online Room Reservations will be the same anticompetitive price across all sites because of Defendants' unlawful conspiracy.  As a result, there is no "best price," but rather a

- 4 -

CLASS ACTION COMPLAINT

simple, arbitrary moniker used by Defendants in an attempt to deceive consumers and mislead consumers away from the reality that all of the prices are artificially inflated and uniform among Defendants.

7.   Defendants' unlawful conduct, including their Price-Fixing Agreements, has injured consumers as a result of hindering competition in the U.S. market for Online Room Reservations (the "Relevant Market") and causing prices to be higher in the Market than they would have been under natural and unadulterated market conditions.  Due to what would have otherwise been a competitive market among OTA Defendants and Hotel Defendants, the Price-Fixing Agreements were intentionally and specifically designed to protect the OTA Defendants from competing for consumers' business and having to sell reservations at discounted rates to earn consumer business. Defendants implemented their conspiracy by mandating higher price levels and thereby foreclosing the competition and/or by eliminating the discounting of Online Room Reservations completely.

8.   But for Defendants' unlawful, anticompetitive and deceitful conduct, Plaintiff and the Class would have paid fair market value for the Online Room Reservations from Defendants–an amount less than what Plaintiff and the Class paid.  Thus, as a direct result of Defendants' unlawful conduct, Plaintiff and the Class were injured, including financially, by paying supra-competitive prices.  Accordingly, Plaintiff and the Class seeks damages and equitable relief under Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and for violations of the Maryland Antitrust Act, MD. CODE ANN., COMM. LAW §§ 11-201 et seq.

///

///

///

CLASS ACTION COMPLAINT

## II.    THE PARTIES

### A.    PLAINTIFF

9.    Paul Bondar is a resident of Los Angeles, California.  Mr. Bondar booked an Online Room Reservation directly from one or more Defendant and paid artificially inflated rates for the rooms he booked.

### B.    DEFENDANTS

10.    Defendant Expedia, Inc. is a Delaware corporation with its principal place of business at 333 108th Avenue NE, Bellevue, Washington 98004.

11.    Defendant Hotels.com LP is an affiliate of Expedia.  Hotels.com LP is a Texas limited partnership with its headquarters at 10440 North Central Expressway, Suite 400, Dallas, Texas 75231.

12.    Defendant Travelocity.com LP is a Delaware limited partnership with its principal place of business at 3150 Sabre Drive, Southlake, Texas. Travelocity is owned by Defendant Sabre.

13.    Defendant Booking.com B.V. is a company based in Amsterdam, the Netherlands, with its principal place of business at Herengracht 597, 1017 CE, Amsterdam, Netherlands. Booking.com B.V. owns and operates Booking.com, the leading worldwide Online Room Reservations travel agency by room nights rented, attracting over 30 million unique visitors each month via the Internet from both leisure and business markets worldwide. Booking.com B.V. is a wholly owned subsidiary of Priceline.com Incorporated.

14.    Defendant Booking.com (USA) Inc. is a Delaware corporation with its primary place of business at 100 William Street, Suite 750, New York, New York 10038. Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline.com Incorporated.

CLASS ACTION COMPLAINT

15.     Defendant Priceline.com Incorporated is a Delaware corporation with its primary place of business at 800 Connecticut Avenue, Norwalk, Connecticut 06854.

16.     Defendant Orbitz Worldwide, Inc. is a Delaware corporation with its corporate headquarters at 500 W. Madison Street, Suite 1000, Chicago, Illinois 60661.

17.     Defendant Sabre Holdings Corporation is a Delaware corporation with its corporate headquarters at 3150 Sabre Drive, Southlake, Texas 76092.

18.     Defendant Intercontinental Hotels Group Resources, Inc. is a Delaware corporation with its primary place of business at 3 Ravinia Drive, Suite 100, Atlanta, Georgia 30346-2149.

19.     Defendant Starwood Hotels & Resorts Worldwide, Inc. is a Maryland corporation with its principal place of business at One Star Point, Stamford, Connecticut 06902. Starwood's hotels are primarily operated under the Brand names St. Regis, The Luxury Collection, Sheraton, Westin, W, Le Meridien, Four Points by Sheraton, Aloft and Element.

20.     Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817-1102.

21.     Defendant Trump International Hotels Management LLC, doing business as The Trump Hotel Collection, is a Delaware limited liability company headquartered at 725 Fifth Avenue, New York, New York 10022.

22.     Defendant Hilton Worldwide, Inc. is a Delaware corporation doing business as Hilton Hotels & Resorts with its primary place of business at 7930 Jones Branch Drive, McLean, Virginia.

23.     Defendant Kimpton Hotel & Restaurant Group, LLC is a Delaware limited liability company with its principal place of business at 222 Kearny Street, Suite 200, San Francisco, CA 94108.

CLASS ACTION COMPLAINT

1

## C.   AGENTS AND CO-CONSPIRATORS

2

24.     In addition to the above named and listed Defendants, Plaintiffs allege that there

3

are various other persons, firms, and corporations who are not named in this Complaint as

4

Defendants, yet who have participated as co-conspirators with the Defendants and have

5

performed acts and made statements in furtherance of the conspiracy.  Some of these persons,

6

firms, and corporations are as of the time this Complaint has been filed yet unidentified.  The

7

acts that have been alleged against the Defendants in this Complaint were authorized, ordered, or

8

done by their officers, agents, employees, or representatives, while actively engaged in the

9

management and operation of Defendants' business or affairs.

10

25.     Each Defendant acted as the principal, agent, or joint venture of, or for, other

11

Defendants with respect to the acts, violations, and common course of conduct alleged by

12

13

Plaintiff.

14

26.     Whenever this Complaint refers to an act, deed, or transaction of a corporation or

15

entity, the Complaint is alleging that the corporation or entity engaged in the act, deed, or

16

17

transaction by or through its officers, directors, agents, employees, or representatives while they

18

were actively engaged in the management, direction, control, or transaction of the corporation or

19

entity's business or affairs.

20

## III.   JURISDICTION AND VENUE

21

22

27.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15

23

U.S.C. § 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable

24

attorneys' fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25

Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. §

26

15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United

27

States.

28

CLASS ACTION COMPLAINT

28.     This Court also has subject matter jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the Class are citizens of a state different from Defendants.

29.     This Court also has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are so related to the claims asserted in this action over which the court has original jurisdiction that they form part of the same case or controversy.

30.     Venue is proper in this judicial district, pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this District, is licensed to do business or is doing business in this District.  Venue is also proper in this District because many of the Defendants reside, transact business, are found, or have agents in this District.  Further, a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

31.     Defendants sold Online Room Reservations in a continuous and uninterrupted flow of transactions in interstate commerce throughout the U.S., including within the District. Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## IV.     STATEMENT OF FACTS

### A.     THE EMERGENCE OF OTA'S

32.     In recent years, the internet travel industry has seen exponential growth, in large part due to the proliferation of the internet and consumer shopping habits, most notably since 1997 to present.  With the revolution of internet commerce came the concept of an "internet travel company" or OTA – an entity organized to effectuate travel plans, reservations and

- 9 -

purchases via the worldwide web. Currently, some estimate more than half of all hotel bookings in the United States are made online, with many taking place through internet travel companies owned by the OTA Defendants.

33.     Consumers book hotel rooms in many different hotels both throughout the country and the world using OTA Defendants' websites. Said companies offer their services both to the Hotel Defendants and consumers through several different business models, which include the "Agency Model," the "Merchant Model," and/or the Wholesale Model."

34.     When operating under the Agency Model, OTAs charge a "service fee" to hotel operators on a transaction basis for booking customers into rooms at a particular hotel with the consumer paying the hotel directly for the room.  Under such a model, the hotels should set, and the OTAs should require, a competitive price for Online Room Reservations in order to increase business and compete against each other, all of whom offer the same service.

35.     When operating under the Merchant Model, the OTAs do not function merely as service providers who collect a fixed transaction fee from the hotels, but rather operate under one of two independent but related transactions, whereby an OTA (a) first purchases the right to rent inventories of hotel rooms at negotiated rates from the Hotel Defendants ("wholesale" rates); and (b) then rents rooms in that inventory to consumers at higher retail prices, keeping the difference as profit. Under such a model, the OTAs should compete on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate for a hotel room.

36.     Finally, the third and last model is the "Wholesale Model," where smaller, price-cutting OTAs obtain access to rooms through wholesalers.  Wholesalers, or intermediaries between the OTAs and the Hotel Defendants, work directly with Hotel Defendants to obtain last minute blocks of rooms that need to be filled.  The wholesalers then make those rooms available to smaller OTAs at a wholesale rate.  The OTAs then, similar to the Merchant Model, rent the

- 10 -

rooms to consumers at higher retail prices, keeping the difference as their profit. Under this model, the OTAs should also compete on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate for a hotel room.

37.     Utilizing the Agency and Merchant Models, the OTA Defendants were able to obtain a dominant presence in the Relevant Market.  The OTA Defendants have as a result become increasingly important to the Hotel Defendants' businesses. Generally calculated, they may generate as much as 50% of the Hotel Defendants' room reservation traffic.  As a result, Hotel Defendants, based on information and belief, are of the general opinion that the access they have to the OTA Defendants' distribution network is critically necessary in order to compete in the Online Room Reservations market.

### B.     The OTA Defendants Conspired with the Hotel Defendants To Eliminate Discounting Below the Rack Rate.

38.     Defendants envisioned, implemented, and executed a scheme to combat and prevent any new or more efficient OTAs, including those that could obtain access to hotel rooms through the Wholesale Model because of the dominance of the OTA Defendants in the Online Reservations Market and with full knowledge that the Hotel Defendants need access to the OTA Defendants' distribution network to remain competitive in the market.

39.     At the time that each OTA Defendant entered into its Price-Fixing Agreements with Hotel Defendants, each OTA Defendant was fully aware that the other OTA Defendants were also entering into Price-Fixing Agreements with the Hotel Defendants.

40.     Additionally, at the time that each OTA Defendant entered into its Price-Fixing Agreements with the Hotel Defendants, they knew that the other OTA Defendants were also entering into Price Fixing Agreements with the Hotel Defendants.

CLASS ACTION COMPLAINT

41.     Finally, each Hotel Defendants also knew at the time that it entered into its Price-Fixing Agreements with the OTA Defendants, the other Hotel Defendants were also entering into Price-Fixing Agreements with the OTA Defendants.

42.     There was a comprehensive conspiracy and agreement to unlawfully and artificially fix the prices of Online Room Reservations at supra competitive prices. Specifically, in 2004, multiple hotels and OTAs, including Defendants Hilton, Kimpton, and Priceline, met and conspired in Las Vegas for EyeforTravel's second annual Revenue Management and Pricing in Travel Conference–a global media company that produces conferences, reports, webinars, and news for online travel industry executives. While at the conference, Defendants, including Hilton, Kimpton, and Priceline discussed "rate parity" and "pricing strategies." Jimmy Shu, then VP of Revenue Management and Distribution at Kimpton, led a presentation intended to "address the issues associated with adapting the rate parity across all distribution channels..." EyeforTravel has annually sponsored these conferences, and the attendees have expanded to include nearly all of the Defendants.

43.     OTA Defendants meticulously monitored adherence to the Price-Fixing Agreements. As part of their efforts to monitor and enforce the conspiracy, the OTA Defendants monitor and enforce the Price-Fixing Agreements by employing personnel to review the rates for Online Room Reservations on competing OTA websites and report any instances of non-compliance. Specifically, "online-travel agencies and franchisors today monitor closely a hotel's rates across all channels, and if a preferential rate were to be given to one over the other that hotel could face penalties." Furthermore, when a "rate parity violation" was discovered, it could result in the hotel's rooms receiving less desirable placement on the OTA's website or being unlisted completely.

CLASS ACTION COMPLAINT

44.     President and CEO of Hospitality eBusiness Strategies Mark Starkov, described how hotel rate parity enforcement typically occurs:

> "If you're out of rate parity, the franchisor will fine you $75 to $150. On the second offense they take you off the (central reservation system). They take you off the CRS and send lawyers after you. After you acknowledge you've been wrong, they will reinstate you for $5,000.

45.     Yet another example of the OTA Defendants' enforcement of the Price-Fixing Agreements occurred on August 31, 2010 as captured in a letter from rival Skoosh.com's ("Skoosh") CEO to OTA Defendant, Booking.com. The letter states in relevant part:

> Both personally, and even as a direct competitor, I was always a fan of Booking.com. Yours was one of the better hotel booking sites I always thought, with some innovative features. However, my rosy picture fast disappeared last winter when Skoosh started being pursued by your business partners insisting that we raise our hotel prices to the same as yours. I'm hoping you can find the time to address some of the points below and restore my faith in your company.

> Some background then. Earlier this year we started getting some calls from angry and confused hoteliers insisting that we were selling their rooms too cheaply. I called them back to work out what was going on and they mostly told me that Booking.com had been on to them threatening all sorts of nonsense if they didn't either remove their hotel from Skoosh or force Skoosh to raise its prices.

> I wondered how this was all happening so quickly and then I did a little research and found that Booking.com has an active policy of maintaining the same prices for all companies across the internet. I even found a job ad of yours looking for "Rate Parity Associates'. It seems like you've got a whole team out there beavering away to 'find any rate inconsistencies between Booking.com and their competitors.' They're doing a good job I have to say. The hoteliers you work with are certainly concerned. One wrote to ask me to close out their hotel on Skoosh: 'just to avoid the penalty that [Booking.com] is threatening us about'.

> Some were less friendly. Many of the hoteliers wrote letters to me threatening legal action. One of them had a colleague of yours on one line and me on the other. It seemed that your colleague was

- 13 -

CLASS ACTION COMPLAINT

insisting that if we hadn't removed their hotel from Skoosh by the end of the phone call Booking.com would cancel the contract with them. They were scared.

46.     Booking.com's threats to cancel its contracts with Hotel Defendants that do not enforce the anticompetitive and unlawful scheme highlights the consistency with which the program was implemented and enforced by Booking.com's parent, Defendant Sabre (which also owns Defendant Travelocity). Sabre advertises its "Rate Assured Hotel Program" to potential customers, certifying that its hotels provide "their best publicly available unrestricted rates that they would also make available through direct and third-party internet sites" and explaining that the program "[e]liminates the need to search the web to confirm the rates found in the *Sabre* system are the same rates offered on the properties' websites." Stated differently, Sabre's Rate Assured Hotel Program required the Hotel Defendants to enforce the anticompetitive conspiracy both internally and through their Price-Fixing Agreements with other OTAs in order for Sabre to be able to safely represent to customers that they will be unable to obtain lower rates directly from hotels or other OTAs.

47.     The unlawful conduct at issue is expressly marketed.  Specifically, Sabre, owner of Travelocity and Booking.com, runs a division called "Sabre Hospitality Solutions." This division expressly markets and encourages hotels to adopt rate parity, the crux of Defendants' unlawful price-fixing scheme to artificially raise prices.  Available at: http://www.sabrehospitality.com/blog/2011-11-30/three-top-trends-in-hospitality-marketing-and-distribution-to-consider-when-planning-for-2012.

48.     Of particular incriminating evidence is the fact that two Defendants here, Sabre and Orbitz, are also alleged to have engaged in similar anticompetitive and unlawful conduct by American Airlines ("American").  A federal court in the Northern District of Texas recently upheld American's Second Amended Complaint. *American Airlines, Inc. v. Travelport Limited,*

- 14 -

1  Civil Action No. 4:11-cv-244-Y (N.D. Tex. August 7, 2012) ("American Airlines Order").

2  Specifically, American alleged the following:

3
4
5
6
7
8
9

> In the past, participating airlines have offered unique content, such as special discount fares, through certain alternative distribution channels that are less costly for the airline as a way to encourage travel agents to use that distribution channel instead of the more costly GDS. Sabre [a GDS] and Travelport [another GDS defendant] have responded to these attempts to generate competition first, by imposing contract terms on the airlines that effectively protect the GDSs from this type of competitive discipline, and second, by retaliating against airlines that have engaged in this type of effort...

10
11
12
13

> Sabre and Travelport make widespread use of most-favored nation ("MFN") provisions in the form of "full content" or "content parity" provisions in their participating carrier agreements that limit participating airlines' ability to encourage the use of one GDS over another or the use of alternative providers of airline booking services other than the GDSs...

14
15
16
17
18
19
20
21

> These MFN clauses effectively require participating airlines such as American to offer each GDS the same content on equivalent terms as those offered to any other GDS or through alternate distribution channels such as an airline's website or through a direct connection. IN this way, they prevent participating airliners from encouraging travel agents or consumers to use alternative, less-costly distribution channels by making certain content available only through those channels.   For example, a participating airline that has signed an agreement that contains a full content provision cannot offer special discounted fares only through the airline's website.  Similarly, an airline cannot make certain fares available only on a GDS that charges lower booking fees as a way to encourage travel agents to use that GDS rather than a GDS that charges the airline a higher booking fee.

22
23  First Amended Complaint (Dkt. #46), *American Airlines, Inc. v. Travelport Limited Civil Action*
24  No. 4:11-cv-244-Y (N.D. Tex. June 1, 2011) at ¶¶ 50-51, 54.

25        49.    When the Court denied defendants' motion to dismiss, it noted:

26
27
28

> American has alleged facts sufficient to support a reasonable inference that Sabre and Travelport have been working together to exclude AA Direct Connect [American's method of providing airline information and booking services directly to travel agents

- 15 -

CLASS ACTION COMPLAINT

without having to go through GDSs] from the Market and submarkets. More to the point here, American has alleged facts from which it may be inferred that Sabre and Travelport have agreed not to compete for American's business, but instead to align themselves together in their negotiations with American.

...More specifically, alleges American, "both Sabre and Travelport require that American provide them with full content and content parity, and restrict American's ability to provide incentives to travel agents to shift bookings among GDSs." (*Id.*) In addition, American alleges that Sabre "has prohibited American from publicly marketing a Direct Connect program." (*Id.*) According to American, "[t]hese provisions effectively prevent American from promoting competition and supporting new entrants in the relevant markets, including competition form its own AA direct Connect."

American Airlines Order at 14-15, 19-20 (quoting American's Second Amended Complaint, which was filed under seal).

50.    Quite similarly, OTA Defendants conspired to create, maintain, and enforce the Price-Fixing Agreements to further their dominance in the Relevant Market and for the anticompetitive purposes of earning excess profits and/or insulating themselves form price competition from the Hotel Defendants and other OTAs here. OTA Defendants conspired together and executed their unlawful conduct in unison by acting together when obtaining the agreement of the Hotel Defendants to impose and enforce the "rate parity" which comprised of eliminating price competition solely for the OTA Defendants' benefit and not for any legitimate and lawful pro-competitive reason. This uniform adoption and enforcement of the "rate parity" and most favored nation clauses by the OTA Defendants is a horizontal price-fixing agreement per se with each OTA Defendant aware that it would be unable to enforce said Price-Fixing Agreements without its rival's implementation and execution of the same rate parity requirements with the Hotel Defendants.

///

- 16 -

CLASS ACTION COMPLAINT

1

2

       **C.**    <u>**DEFENDANTS MONITORED AND ENFORCED THE PRICE-FIXING AGREEMENTS.**</u>

3        51.    Hotel Defendants propagated their unlawful conspiracy to Price-Fix by

4 compelling non-defendant OTAs to agree to raise and maintain retail prices for Online Room

5 Reservations at the Rack Rate.   Hotel Defendants' egregious conduct included at times

6 threatening non-defendant OTAs with legal action and/or refusing to allow said OTAs, such as

7

8 Skoosh, to list their rooms if they did not agree to post price-fixed listing and maintain resale

prices at the Rack Rate.   In addition, Hotel Defendants also required wholesalers to withdraw

9

10 inventory of Online Room Reservations from any non-defendant OTA that did not maintain

11 prices at or above the Rack Rate.   These actions in totality were taken to demonstrate and clearly

12 illustrate Hotel Defendants' adherence to the Price-Fixing Agreements.  One example of a public

13 complaint is apparent in Skoosh's public complaint that when it tried to advertise discounted

14 prices for hotel rooms book on its online travel site but was prevented:

15

16             "We were openly discounting and hotels would email, call and threaten legal action," Skoosh told the BBC.

17             "Either we'd have to raise prices or take the hotels off our list," said Dorian Harris from Skoosh."

18

19        52.    Even more specifically, Skoosh has claimed that the Price-Fixing Agreements

20 have "created a Mafia-style atmosphere and an intolerable climate for new businesses. Skoosh

21 has been directly threatened and, in turn, has defended its right to discount hotel prices."

22        53.    Thus, Hotel Defendants are enforcing the Rack Rate against price-cutting

23 competing OTAs pursuant to Defendants' Price-Fixing Agreements, specifically:

24

25        (a)    Defendant Hilton required Skoosh's wholesale supplier in the United

26 States, AlliedTPro, to entirely cut off its contract with Skoosh as a result of Skoosh's discounting

27 and Defendant Hilton's enforcement of the Price-Fixing Agreements.   AlliedTPro wrote to

28

CLASS ACTION COMPLAINT

1  Skoosh: "Trust me I would welcome the additional business but cannot risk our contracts with

2  Hilton."

3              (b)       Defendant Trump expressly admitted it was enforcing the Price-

4  Agreements, e-mailing Skoosh:

5

6           "The simple answer is; if we do not maintain parity with all, we are
            threatened with poor placement on sites and worst case...removal
7           of hotel from sales sites.  That is the way the OTA's operate in the
            USA. Expedia threatens if Travelocity gets lower rate and vice-
8           versa. It is a vicious cycle if we get out of parity.

9           I think the model in Europe is built to operate more competitively
            but that is not the model here. (Much as I wish it was the same as
10          Europe!) I hope this helps you understand why we must be strict
            with what is offered on all websites. Thanks, Trump International.
11

12              (c)       In 2003, Defendant Marriot announced "a sweeping overhaul of its

13  transient pricing, bringing parity to all Marriott distribution channels – offline and online."

14  During the relevant period, Marriott was among the Hotel Defendants threatening Skoosh with

15  legal action and/or refusal to allow Skoosh to advertise Marriot rooms if Skoosh did not maintain

16  rate parity.

17              (d)       Defendant Intercontinental wrote to Skoosh "demanding that Skoosh

18

19  either raise [] its rates to the same as the hotels and its other distribution partners (a practice

20  known in the industry as 'rate parity' ***) or remove the hotels entirely from our site."

21              (e)       Defendant Starwood likewise enforces the Price-Fixing Agreements. "In

22  one e-mail to a hotel discounter, an executive at Starwood, which runs Le Meridien, Westin, W,

23  and Sheraton hotels, said: 'Should a wholesaler decide to sell the rooms on a room only basis, he

24  has to make sure that the per contract agreed minimum mark-up is guaranteed.' The employee

25  said the 'violation' of Starwood's Best Rate Guarantee was 'really serious' and the breach was

26  reported to the Brussels headquarters."

27

28
                                          - 18 -

CLASS ACTION COMPLAINT

54.     Similarly, Kayak.com, which is a price comparison website, told Skoosh on several occasions that it had to "play the Orbitz game," *i.e.* maintain rate parity, or Kayak would no longer publish Skoosh's prices. Kayak apparently felt pressured to enforce rate parity on behalf of the OTA Defendants because, for example, Orbitz accounted for 18.8% of Kayak's total revenues and Expedia and its affiliates accounted for 24.9% of Kayak's total revenues for the nine months ending September 30, 2010. After Skoosh reported the price-fixing scheme to governmental authorities, Kayak stopped publishing Skoosh's prices on its price comparison site.

55.     Said actions were taken because of the pressure the OTA Defendants placed on Hotel Defendants to protect the OTA Defendants' margins by enforcing the Price-Fixing Agreements. The Hotel Defendants agreed to enforce the Price-Fixing Agreements because they feared losing access to the OTA Defendants' websites if they did not abide by them. This has been described by industry analyst Ashwin Kamlani, founder of Hotel Internet Help Inc., which helps independent hotels get more sales, as follows:

> "I don't know that there's been enough public questioning of this [rate parity] practice. The hotels enforce rate parity because they fear the consequences of not maintaining rate parity. They fear having their hotel dropped to page 6 or even pulled off their largest producing [online travel agents] sites, which translates into a potentially significant loss of revenue."

56.     Hotel Defendants knew that the OTA Defendants would enforce the Price-Fixing Agreements or refuse to list the Hotel Defendants' rooms.  Specifically, in 2009, Defendant Expedia refused to list Choice Hotels' rooms. Expedia's CEO and President Dara Khosrowshahi explained:

> "...As far as the discussions that we've had with Choice, we are not doing business with Choice right now on a chain basis. We don't have a vast majority of Choice hotels on our side. First of all, our primary goal is to have the broadest, deepest set and highest quality set of inventory for the benefit of our customers. And this doesn't signal any kind of change in our overall philosophy as far

- 19 -

CLASS ACTION COMPLAINT

as how we work with our hotel partners and what we're looking at. It's not really an issue of economics; it's more than issue of our wanting grate parity and inventory parity for our customers. When our customers come to Expedia, we want them to know that they're getting the best prices and certainly, we are insistent on that.   And to the extent that Choice doesn't want to work under those terms. We won't be doing business with each other. Those are the terms that we work with our others [sic] strategic partners, they're comfortable where they were comfortable with it. So, its nothing usual from what I would say is typical practice for us in most of our other OTA competitors so to speak."

57.    Blink Booking, a mobile-only hotel booking service, repeated the claims of competing OTAs when it stated: "We've long believed that the big online travel agents have been guilty of denying consumers the best prices-and that hotels' hands are tied by price parity agreements. The online travel market may appear to offer plenty of choice and competition, but the reality is that there are lots of different shop windows selling the same rooms at the same prices – with those prices agreed through parity deals between the big groups and the big OTAs."

58.    In totality, the Hotel Defendants did not and are not simply or unilaterally:

(a)    refraining from listing hotel rooms below the Rack Rate on their own websites;

(b)    refraining from doing business with uncooperative OTAs;

(c)    suggesting Rack Rates that were and are widely follows;

(d)    sanctioning, terminating, or refusing to deal with OTAs that failed to maintain the Rack Rates;

(e)    announcing and enforcing policies of sanctioning, terminating, or refusing to do business with OTAs that failed to maintain the Rack Rates; or

(f)    sanctioning, terminating, or refusing to do business with other OTAs following, or in response to, complaints by retailers such as the OTA Defendants.

- 20 -

CLASS ACTION COMPLAINT

59.   The Price-Fixing Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between the OTA Defendants, the Hotel Defendants, and other OTAs.

60.   Hotel Defendants did not unilaterally or independently or in their own economic interests, but rather in unlawful conspiracy, when:

        (a)     entering into the Price-Fixing Agreements;

        (b)     seeking OTAs' acquiescence to, and compliance with, the terms of the Price-Fixing Agreements;

        (c)     seeking to have OTAs list hotel rooms at the Rack Rates; or

        (d)     terminating or refusing to deal with OTAs for violating the Price-Fixing Agreements.

61.   Absent threats or penalties or sanctions by the OTA Defendants, there would be independent economic self-interest reason for Hotel Defendants to enter into, maintain, or enforce the Price-Fixing Agreements. Thus, without said unlawful Agreements, hotel rates would not be set at the Rack Rates and there would exist price competition in the Online Room Reservations Market.

**D.**    **THE PRICE-FIXING AGREEMENTS HAVE PURPOSEFULLY RESULTED IN "RATE PARITY" FOR HOTEL ROOMS BOOKED THROUGH ONLINE ROOM RESERVATIONS – ALLOWING THE OTA DEFENDANTS TO ALWAYS GUARANTEE THE "BEST," THOUGH SAME, PRICES.**

62.   Defendants' unlawful price-fixing conspiracy was successful in achieving their unlawful goal, Defendants do not compete on the basis of price.  Instead, virtually all Online Room Reservations are posted at the Rack Rate.

CLASS ACTION COMPLAINT

63.   Further evidence of Defendants' unlawful conspiracy is evidenced in the testimony of Tim Gordon, Senior Vice President of Priceline, who made it clear that each of the OTA Defendants buys the right to rent the rooms to the public at exactly the same price:

Q.   And in fact, sir, lets take a look at ALL22. And this is a printout I did back in September for a night's stay at the Hilton in San Antonio…$219 rate, taxes and then a total. And then if you will look through, I've printed out from the various websites, same hotel, same night. Orbitz has its $219.00 rate. Cheap Tickets has its $219.00 rate. Lowest Fare has a $219.00 rate. Priceline, $219.00 rate. Travel Now, $219.00. Expedia, $219.00. And Hotels.com, $219.00. Every website lists this room on this night at the exact same room rate. And you know – you know, based upon the way the contracts work, that doesn't surprise you, does it?

A.   No.

Q.   And why doesn't that surprise you?

A.   Because in general – and I can't be too specific because I don't know the exact terms of this agreement, but in general the contracts require us to take a net rate that they provide and mark it up by a specific amount. And they require us to mark it up by that amount.

Q.   By that exact amount?

A.   Yes.

Q.   And your understanding is that you have best price guarantee from Hilton where they can't offer your competitors more heavy discounts than they can offer Priceline, correct?

A.   That is true.

***

Q.   All right. And so given the Most Favored Nations Clause that Hilton has, your understanding would be everybody-all these competitors are being provided this room at the same price and marking it up by the same amount resulting in the same retail rate, correct?

- 22 -

CLASS ACTION COMPLAINT

A.    I believe that to be true.

Exhibit C to Response in Opposition to Motion in *Limine* Regarding Disclosure of Confidential

Information at Class Certification Hearing (Dkt. #188), *San Antonio v. Hotels.com*, No. SA-06-

CA-381-OG (W.D. Tex. May 14, 2007).

64.    Specifically, a federal court in the Western District of Texas recently commented

on the similarity of the business models and pricing structures of the OTA Defendants:

> After reviewing the record, it is clear that the Defendants not only
> engage in a common course of conduct, but that many of their
> business practices are virtually identical. These practices include
> but are not limited to the manner in which they contract with the
> hotels, the manner in which they determine and assess cancellation
> policies and fees, the manner in which they determine the mark up
> and fees to arrive at an acceptable margin and retail/sell rate; and,
> the manner in which they calculate, assess and pay hotel
> occupancy taxes. The deposition testimony of the corporate
> representatives, standing alone, reflects an amazing similarity in
> practice, procedure and corporate methodology among all of the
> [Online Travel Agent Defendants].

*San Antonio v. Hotels.com*, No. SA-06-CA-381-OG (W.D. Tex. May 27, 2008) (the "San

Antonio Class Cert Order") at 18-19 & n. 17. (emphasis added).

65.    Furthermore, the Court noted that, during the deposition of Peggy Bianco, Vice

President of Global Hotel Services for Orbitz, "Plaintiff's counsel was obviously curious...to

determine exactly how the companies remain competitive, considering that they operate in the

same fashion and even charge the same price," and recounted Ms. Bianco's testimony as follows:

> Q.    So – so given that, how do you compete with Expedia and
> Travelocity and the like if everybody is contractually bound
> to charge the same price for that hotel room?
>
> A.    Right. I don't have knowledge of the other contracts; but,
> you know, relative to competing, our sites market and make
> available and distribute the opportunity for consumers to
> reserve hotel rooms and, you know, *its really in our*
> *marketing and distribution strategies in terms of how we*
> *compete.*

- 23 -

CLASS ACTION COMPLAINT

San Antonio Class Cert Order at 19 n. 18.

66.     Based on upon deposition testimony, the Court determined that the margins of each of the OTA Defendants were identical to the other OTA Defendants, stating:

> Almost without exception, the net rate and sell rate for a given room on a given day are the same among the [OTA Defendants] because the Defendants' agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" clauses. This also makes the [OTA] margins the same.

*Id.* at 20, n.21 (citations to deposition testimony omitted).

67.     Due to the meticulous implementation and exquisite execution of Defendants' conspiracy, Defendants were so confident in the success of their price-fixing scheme that OTA Defendants had no hesitation in making "best price" guarantees to consumers because they knew full well that all the same room prices were identical and set evenly across "competitors." Examples include: Travelocity's "Low Prices, Guaranteed"; Expedia's "Best Price Guarantee"; Booking.com's "Best Price Guaranteed"; Hotels.com's "Price Match"; and Orbitz's "Orbitz Low Price Guarantee."

E.     **GOVERNMENTAL INVESTIGATIONS**

68.     Defendants' unlawful conspiracy to price-fix extends beyond the confines of the United States. Specifically, on July 31st, 2012, the British Office of Fair Trade ("OFT") issued a "Statement of Objections" alleging that Expedia infringed competition through nearly identical price-fixing agreements with respect to British hotel rooms. The *Telegraph* reported that Expedia admitted that "it has engaged in cartel conduct on reach of the law," and is "providing information on its rivals under a 'leniency deal'" with the British authorities.

69.     The British disclosures yet again clearly demonstrate that the OTA Defendants are entering into contracts with the same Hotel Defendants in the U.S. and to achieve the same anticompetitive effect.

- 24 -

CLASS ACTION COMPLAINT

1
2

### V.   MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT.

3   70.   The overall effect of Defendants' anticompetitive, exclusionary scheme has been

4   to substantially foreclose and impair competition (and the threat of such competition) from other

5   OTAs and/or Hotel Defendants that desired to discount the Rack Rate. As alleged above, had the

6   Defendants not improperly foreclosed or stifled actual or potential competitors from competing

7   in the Relevant Market, other actual or potential rival OTAs would have achieved much greater

8   
9   sales than they actually did (or threatened to do), given the lower prices that they advertised (or

10   could have advertised upon entry), and would have posed a far greater competitive threat to the

11   Defendants.

12   71.   The presence of unfettered competition from actual or potential competitors,

13   which were advertising lower-priced Online Room reservations, would have forced the

14   Defendants to lower the prices for Online Room Reservations to remain competitive and/or to

15   
16   counter a perceived threat of additional entry.

17   72.   During the relevant period, Plaintiff and the other members of the Class booked

18   Online Room Reservations directly from the Defendants. As a result of Defendants' illegal

19   conduct, Plaintiff and the other members of the Class were compelled to pay, and did pay,

20   artificially inflated prices for Online Room Reservations. Plaintiff would have been able to, *inter*

21   *alia,* book Online Room Reservations at less-expensive prices had actual or potential competitors

22   been able to engage in unfettered competition. The prices that Plaintiff and the other Class

23   
24   members paid for Online Room Reservations were substantially greater than the prices that

25   Plaintiff and the Class members would have paid absent the illegal conduct alleged herein

26   because: (1) the prices of all Online Room Reservations were artificially inflated by Defendants'

27   illegal conduct; and (2) Class members were deprived of the opportunity to book Online Room

28

CLASS ACTION COMPLAINT

Reservations from the Defendants' competitors at substantially lower prices.  Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

## VI.   CLASS ALLEGATIONS

73.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and all members of the following class (the "Class"):

> All persons and entities throughout the United States who booked Online Room Reservations directly from a Defendant from 2004 to present (the "Class Period").  Expressly excluded are (i) room reservations made as part of a package deal; (ii) room reservations made without disclosure of the name of the hotel until after paying for the room reservation; and (iii) room reservations which were ultimately cancelled and not paid for.

74.   Plaintiff believes that the Class includes many thousands of consumers and businesses across the United States, though the exact number and the identities of the Class members are currently unknown.

75.   The members of the Class are so numerous that joinder of all Class members is impracticable.

76.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and will apply uniformly to every member of the Class.  Among the questions of law and fact common to Class members are:

(a)   whether Defendants engaged in agreements, contracts, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting access to competing and lower-priced hotel rooms listed online;

(b)   whether Defendants unreasonably restrained trade;

- 26 -

CLASS ACTION COMPLAINT

(c)     whether Defendants' anticompetitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class to suffer antitrust injury in the nature of overcharges;

(d)     whether Defendants' unlawful conduct caused Plaintiff and other Class members to pay more for Online Room Reservations than they otherwise would have paid;

(e)     the appropriate Class-wide measure of damages; and

(f)     whether, and in what amount, Plaintiff and the other Class members are entitled to recover treble damages, court costs, and attorneys' fees;

(g)     whether Defendants' anticompetitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

77.     Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff and every member of the Class have suffered similar injuries as a result of the same practices alleged herein.  Plaintiff has no interest adverse to the interests of the other members of the Class.

78.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in antitrust class action litigation. The interests of Plaintiff is a coincident with, and not antagonistic to, the interests of the other Class members.

79.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

80.     Plaintiff and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will retain substantial funds received a result of their wrongdoing, and such unlawful and improper conduct

- 27 -

shall, in large measure, go unremedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity and retain the proceeds of their ill-gotten gains.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation.  There will be no difficulty in the management of this action as a class action.

## VII.     TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND CONTINUING VIOLATIONS

82.     Plaintiff repeats and re-alleges each of the foregoing allegations as if fully set forth herein. Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims alleged herein until July 31st, 2012, when the OFT issued its Statement of Objections.

83.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

84.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

85.     Defendants continue to engage in the deceptive practice, and consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct. Therefore,

- 28 -

CLASS ACTION COMPLAINT

Plaintiff and the Class submit that each instance that Defendants engage din the conduct complained of herein and each instance that a member of the Class purchased an Online Room Reservation constitutes part of a continuing violation and operates to toll the statutes of limitation in the action.

86.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

87.     Defendants' conduct was and is, by its nature, self-concealing. Still Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class from learning of their illegal, anticompetitive, unfair, and/or deceptive acts.

88.     By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## XIII.     COUNTS

## COUNT I

## VIOLATION OF 15 U.S.C. § 1

## (AGREEMENTS UNREASONABLY RESTRAINING TRADE)

89.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

90.     The Price-Fixing Agreements, and their enforcement, constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the Relevant Market, and harmed Plaintiff and the Class thereby.

91.     The Price-Fixing Agreements cover a sufficiently substantial percentage of the Relevant Market to harm competition.

CLASS ACTION COMPLAINT

92.    Defendants' Price-Fixing Agreements are a *per se* violation of 15 U.S.C. § 1.

93.    In the alternative, Defendants are liable for the creation, maintenance, and enforcement of the Price-Fixing Agreements under a "quick look" and/or rule of reason standard.

94.    The Defendants possess market power in the Relevant Market.

95.    The Price-Fixing Agreements unlawfully harm competition by artificially raising and stabilizing prices.

96.    There is no legitimate, pro-competitive business justification for the Price-Fixing Agreements or any of them that outweighs their harmful effect.  Even if there were some conceivable justification, the Price-Fixing Agreements are broader than necessary to achieve such a purpose.

97.    Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the Relevant Market.

98.    Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Online Room Reservations than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT II

### VIOLATION OF THE MARYLAND ANTITRUST ACT
**MD. CODE ANN., COMM. LAW §§ 11-201 *et seq.***

99.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

100.    The Price-Fixing Agreements, and their enforcement, constitute unlawful contracts, combinations, or conspiracies in restraint of the trade or commerce in violation fo the Maryland Antitrust Act, MD. CODE ANN., COMM. LAW §§ 11-201 *et seq.*

- 30 -

CLASS ACTION COMPLAINT

101.   Both the vertical and horizontal restraints of trade that resulted from the Price-Fixing Agreements are *per se* illegal under Maryland law.

102.   The aforesaid violations of the Maryland Antitrust Act constitute, without limitation, a continuing unlawful contract, combination, or conspiracy among Defendants and their co-conspirators, the substantial terms of the which were to fix, raise, maintain, and stabilize the price of Online Room Reservations.

103.   The unlawful contract, combination, or conspiracy alleged herein has had, *inter alia*, the following effects:

(a)   Price competition in the sale of Online Room Reservations has been restrained, suppressed, and/or eliminated in the State of Maryland and throughout the United States;

(b)   Prices for Online Room Reservations from Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in the State of Maryland and throughout the United States; and

(c)   Those who booked Online Room Reservations from Defendants have been deprived of the benefit of free and open competition; and

(d)   Plaintiff and the other members of the Class purchased Online Room Reservations from the Defendants. By reason of the alleged violations of the antitrust law, Plaintiff and the other members of the Class paid more for Online Room Reservations than they would have paid in the absence of the Price-Fixing Agreements. Plaintiff, on behalf of himself and the members of the Class, ahs been injured in his business or property as a result of Defendants' violations of the Maryland Antitrust Act, Md. Code Ann., Comm. Law §§ 11-201 *et seq.*

///

CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

Plaintiff, on his behalf and on behalf of the Class, prays for judgment, as follows:

A.  An order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative and his counsel of record as Class Counsel;

B.  A declaration that Defendants' conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.  A declaration that Defendants' conduct is in violation of the Maryland Antitrust Act, Md. Code Ann., Comm. Law §§ 11-201 *et seq.*;

D.  Treble damages under the antitrust laws as well as actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes cited herein;

E.  Permanent injunctive relief to enjoin further violations of the law;

F.  Pre-judgment and post-judgment interest on monetary relief awarded;

G.  The costs of bringing this suit, including reasonable attorneys' fees; and

H.  All other relief to which Plaintiff and the other members of the Class may be entitled which the Court deems proper.

///
///
///
///
///
///
///

- 32 -

CLASS ACTION COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands trial of his claims by jury to the extent authorized by law.

3

4

Dated: December 3, 2012

5

6
                                        Respectfully Submitted,

7
                                        /s/ Ralph B. Kalfayan
                                        Ralph B. Kalfayan (*Pro hac vice* to be submitted)
8                                       Krause Kalfayan Benink & Slavens, LLP
                                        550 W. C Street
9                                       Suite 530
                                        San Diego, CA 92101
10                                      Phone: 619-232-0331
                                        Fax: 619-232-4019
11                                      Ralph@kkbs-law.com

12

13

14                                      /s/ Paul Mark Sandler
                                        Paul Mark Sandler Federal Bar No. 00145
15                                      Robert B. Levin Federal Bar No. 00695
                                        Shapiro Sher Guinot & Sandler
16                                      36 South Charles Street
                                        Suite 2000
17                                      Baltimore, MD 21201
                                        Phone: 410-385-0202
18                                      Fax: 410-539-7611
                                        pms@shapirosher.com
19                                      rbl@shapirosher.com

20
                                        *Attorneys for Plaintiff, Paul Bondar*
21

22

23

24

25

26

27

28

- 33 -

CLASS ACTION COMPLAINT